## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID DUYST,

                 Petitioner,                  Case Number: 2:08-CV-11728

v.                                         HON. VICTORIA A. ROBERTS

LLOYD RAPELJE,

                 Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY

Petitioner David Duyst, through counsel, filed a petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254. Petitioner is serving a life sentence and is

incarcerated at the Saginaw Correctional Facility in Freeland, Michigan. He challenges

his convictions for first-degree murder and possession of a firearm during the commission

of a felony on the ground that he received ineffective assistance of counsel.

The Court denies the petition.

### I. Facts

Petitioner's convictions arise from the shooting death of his wife, Sandra Duyst, on

March 29, 2000. Sandra's death was caused by two gunshots to the head. Petitioner was

convicted of fatally shooting Sandra. His defense was that the gunshot wounds were self-

inflicted, resulting from a malfunctioning of the gun which caused the gun to discharge

twice as the result of a single trigger pull. According to Petitioner, Sandra was alone in

their bedroom when the shooting occurred and he only entered the bedroom after hearing gunshots.  Petitioner called 911.  Initially, the police treated the death as a suicide.  However, the medical examiner later ruled it a homicide based on the presence of two, rather than one, gunshots to the head.

Tim, the 11-year-old son of the Duysts, testified that the evening before his mother's death she seemed to be her usual self.  He and his brother shared an upstairs bedroom; his parents' bedroom was on the main floor.  When he woke up on the morning of his mother's death, he heard two loud noises that sounded to him like two loud piano cords.  About ten seconds after he heard the loud noises, he heard his father move from the family room, through the kitchen and hallway and into the bedroom.  He heard his father open the bedroom door forcefully.  Tim testified that the door to his bedroom was shut when he heard the loud noises and his father's subsequent footsteps.  He testified that his mother was frightened of guns and did not own one.

Erica Duyst, Tim's 13-year-old sister, testified that the night before her mother died, she saw Sandra in bed doing crossword puzzles before she went to sleep in her upstairs bedroom.  The next morning, she was awakened by the sound of her father running upstairs.  She heard urgent voices and left her bedroom.  She was told to stay upstairs with her brother Tim.

Erica also testified that, in November 1998, her mother suffered serious injuries when she was kicked by a horse she owned, Dexter.  Many additional witnesses testified that Sandra told them that her serious injuries were caused by her horse.  Erica testified

2

that, after her mother was released from the hospital, her mother and father fought more

frequently and her mother seemed depressed.

David Duyst, Jr., testified that his mother seemed to be normal on the day before

her death.  On the morning of March 29, 2000, David, Jr., was lying in bed when he heard

two loud bangs, approximately half a second apart.  He then heard footsteps coming from

the TV room, through the kitchen, and then heard the bedroom door violently opened.  He

heard Petitioner on the phone.  David, Jr., went to the stairway to go downstairs and saw

his father on the stairs.  His father was on the phone and told David, Jr., that Sandra had

shot herself.  David, Jr., testified that his mother did not like guns.

Sheriff's deputy Daniel J. Scalici testified that he was contacted on the morning of

March 29, 2000, and told to report to the Duyst home, where a suicide had been reported.

When he arrived at the home, several other deputies were present.  He entered the

bedroom and observed a great deal of blood on the bed.  Two shell casings were

recovered, one on the night stand, the other on the floor.  Scalici had a brief conversation

with Petitioner, during which Petitioner explained that he had fallen asleep on the couch

of the TV room and was awakened by a gunshot.  He immediately went to the bedroom,

where he found his wife and then called 911.  Petitioner told Scalici that the gun in the

bedroom was his and he had purchased it weeks earlier.

Scalici left the crime scene to attend the autopsy, performed by Dr. Stephen Cohle,

a forensic pathologist.  Dr. Cohle had found one entrance wound by the time Scalici

arrived.  After approximately ten minutes, Dr. Cohle found a second entrance wound.  He

also identified two exit wounds.  The medical examiner indicated to Scalici that the death would not be ruled a suicide.

Scalici testified that in a subsequent conversation with Petitioner he admitted that he was involved in an affair with one of his employees, Linda Ryan.

David DeHaan testified that he was employed in the Kent County Sheriff's Office in the scientific support unit.  He responded to the report of a shooting at the Duyst home.  When he arrived at the scene, he was informed that the death was a suicide.  He photographed the scene.  After the autopsy revealed two bullet entry wounds, he returned to the crime scene.  He discovered that the room had been cleaned up.  The bedding had been pulled off the bed and placed in plastic bags.

Dr. Cohle testified concerning the autopsy.  Before performing the autopsy, he received a case history informing him that she was alone in her bedroom when her husband heard a loud noise coming from that room.  He went to the bedroom and discovered her with a large amount of blood coming from her head.  Dr. Cohle testified that during the course of the autopsy he examined Sandra's hands to look for gunshot residue.  He found none.  He also examined the firearm used in the shooting and saw blood spatter on the weapon.  Given that he was informed that this was a suicide and that he saw blood spatter on the weapon, he expected to find blood spattering on Sandra's hands.  He did not.  Dr. Cohle testified that he discovered two bullet entry wounds and two exit wounds.  He was able to conclude based upon the characteristics of the entry wounds that both were made by the gun being in loose contact with the scalp.  Dr. Cohle

4

determined that the first bullet wound would have rendered Sandra unconscious and, although heartbeat and respiration may have continued for a bit, she was essentially dead. She would have been completely incapacitated and incapable of any voluntary movement. Dr. Cohle testified that, after sustaining the first gunshot wound, Sandra would have been incapable of pulling the trigger a second time. Dr. Cohle concluded that the manner of Sandra's death was homicide.

At the request of the prosecution, Dr. Cohle did not immediately issue a death certificate; instead he solicited a second opinion on the manner of death from another forensic pathologist, Vincent DiMaio.

Dr. DiMaio testified that he reviewed the autopsy report, photographs of the victim and of the weapon, and a police investigative file. He testified that it would have been impossible for Sandra to inflict the second bullet wound because of the nature of the injuries caused by the first wound.

The clothing worn by Petitioner on the day of Sandra's death was submitted to the State Police evidentiary laboratory. Rodney Wolfarth, a biology unit supervisor, testified that he performed a visual inspection of Petitioner's clothing without using a magnifying glass or microscope and detected no evidence of blood on the clothing.

Jeffery Crump, who was employed at the Michigan State Police Crime Lab as a firearms examiner, testified as an expert in firearms. He testified that he test-fired the weapon that caused Sandra's death. He test-fired the gun six times. The gun worked properly. He also tested the trigger pull and found it to require between 8-1/4 and 8-1/2

5

pounds of weight to get the trigger to pull.  The factory specifications for this type of firearm are between eight and ten pounds.  This particular firearm required the same weight for initial and subsequent trigger pulls.

Bradford Bacheldor also testified for the prosecution as an expert witness in firearms.  He testified that the gun was test-fired by his son and appeared to be functioning normally.  He also testified that the number of safety mechanisms inherent in this firearm to prevent accidental firing appeared to be functioning properly.

Rod Englert testified as an expert in crime scene reconstruction.  He testified that he examined the pillows and fitted sheets from the crime scene and Petitioner's clothing. He testified that he observed a high-velocity mist pattern of blood spatter on the fitted sheet and pillows.  He also observed a void in the pattern consistent with something having been present at the time the shots were fired to intercept the high velocity mist and prevent it from being deposited on the sheet.  He testified that the void was consistent with someone firing the fatal shots while standing behind Sandra.  That person would have intercepted some of the high velocity blood spatter which would otherwise have landed on the sheets.  He found evidence of blood spatter on both sides of the gun.  He concluded that the absence of blood spatter on Sandra's hands indicated that she did not fire the gun.

Englert examined Petitioner's clothing for evidence of high-velocity blood mist. Using a magnifying glass and high-intensity lights, he located numerous spots on Petitioner's shirt that appeared to be blood.  He testified these spots were consistent with

6

high-velocity blood mist. He testified that these spots were inconsistent with coughed or expired blood.

An expert in DNA analysis, Shawn Weiss, testified that three of the spots identified by Englert as high-velocity blood spatter matched Sandra's DNA on all eight genetic markers tested. He testified that the probability of randomly selecting an unrelated individual with a DNA statistic consistent with Sandra's on this stain is one in 16.6 million for the Caucasian population.

Mary Ellen Spring, Sandra's sister, testified that in the spring of 1999, Sandra called Spring and said, if anything should happen to her, she had left a note in the china cabinet. After the phone call, she had a prayer group meeting and told the other members about her sister's phone call. As time passed, Spring forgot about the conversation and the note. Spring was reminded of the letter by a member of her prayer group after her sister's death. Spring testified that she immediately contacted the police, who found a letter inside the china cabinet. The parties stipulated that a fingerprint on the letter belonged to Sandra and that saliva found on the envelope matched Sandra's. The letter stated that the head injuries Sandra sustained on November 19, 1998, were not caused by her horse Dexter, but by Petitioner. It also stated that, if anything happened to her, Petitioner should be looked at as a suspect, and that she would never commit suicide.

Linda Ryan testified that beginning in 1995, she worked for Petitioner and his partner, Larry Bos, Sr., at their insurance company, Northwestern Mutual Life. The partnership dissolved in 1999, and Ryan continued working with Petitioner. In July 1998,

she began an affair with Petitioner.  She was aware that Petitioner and Sandra argued

often.  Petitioner informed her that Sandra had tried to commit suicide three times.  She

and Petitioner discussed divorcing their respective spouses so that they could marry one

another.  Ryan's divorce from her husband was final on February 7, 2000.  Ryan took a

leave of absence in March 2000 because she was having difficulty with her ex-husband

and because Petitioner had not gotten divorced.  She wanted him to choose between her

and Sandra.  Between the time she began her leave and March 27, Ryan only saw

Petitioner once in person at an office meeting, though she spoke to him on the phone

more than that.  On March 27, 2000, Petitioner came to her apartment and told her he had

made the decision to divorce Sandra.  Petitioner told Ryan that Sandra had been looking

at the apartment section of the newspaper the previous Sunday and that, whether she left

or not, he would file for divorce.  At 11:00 p.m. that evening, Ryan visited a website that

allows users to design their own engagement rings.

The prosecution also presented evidence that Petitioner's income declined in the

years  preceding Sandra's death and that Sandra was insured for in excess of half a

million dollars.

Petitioner testified in his own defense and denied killing his wife.  Petitioner first

testified generally about his upbringing and his family.  He testified about the head

injuries sustained by Sandra on November 19, 1998.  He testified that, on that date, he

entered the horse barn that they maintained on their property and heard moaning coming

from Dexter's stall.  He found Sandra slumped on the ground.  He went into the stall and

helped her out.  She had blood streaming down her face and told him that Dexter had

repeatedly kicked her.  Petitioner called 911 and Sandra was hospitalized for seven days.

After the accident, Sandra became severely depressed, gained weight, and had memory

problems.  He testified that between the time of the accident and when she died, Sandra

attempted suicide three times.

Petitioner admitted that he began an affair with Linda Ryan in 1998.  He testified

that on February 29, 2000, he had a meeting with a divorce lawyer.  In the beginning of

March 2000, Ryan took a leave of absence from work due to pressures related to her

divorce.  Petitioner testified that Ryan never gave him an ultimatum to choose between

her and Sandra.  He testified that on Friday, March 24, 2000, he informed Sandra that he

was going to file for divorce and that he had an excellent chance of gaining custody of the

children. Sandra did not respond.  On Sunday, March 26, he observed Sandra looking

through the apartments-for-rent section of the newspaper.  On March 27, he went to

Ryan's house to tell her that he had decided to file for divorce.  On the evening of March

28, Petitioner fell asleep on the couch.  He was awakened by a loud bang.  He ran to the

bedroom, opened the door, and saw Sandra on the bed, gurgling and coughing.  After a

few moments, he noticed the gun in Sandra's hand; it was covered by a sheet.  He took

the gun out of her hand and removed the magazine.  Petitioner then called 911.

Petitioner testified that he purchased the gun in January 2000.  He was prompted to

purchase the gun because he and his deceased brother used to enjoy going to the firing

range together.  Additionally, his son, David, Jr., was interested in guns and this was

9

something he felt they could share.

The defense presented two expert witnesses in psychiatry and psychology.  Both
testified that Sandra's behavior prior to her death was consistent with someone who was
contemplating suicide.  The defense presented numerous witnesses who testified that
Sandra's behavior was markedly different since the head injury in 1998.  The defense also
presented testimony from several witnesses that the amount of Sandra's life insurance
policy was appropriate.

## II.  Procedural History

Following a jury trial in Kent County Circuit Court, Petitioner was convicted of
first-degree murder and possession of a firearm during the commission of a felony.  On
May 17, 2001, he was sentenced to life in prison without the possibility of parole for the
murder conviction, to be served consecutively to two years in prison for the felony-
firearm conviction.

Petitioner filed an appeal of right in the Michigan Court of Appeals.  Petitioner
was represented by the same attorney who represented him at trial.  The following claims
were presented:

I.     Whether reversible error was committed and whether the appellant was
       deprived of his federal and Michigan due process rights to a fair trial when
       the authorities failed to preserve vital evidence and when the trial court
       refused to preclude evidence of the same nature as the evidence which was
       retained as a remedy for the authorities' actions.

II.    Whether reversible error was committed and whether the appellant was
       deprived of his federal and Michigan due process rights to a fair trial when
       the trial judge refused to give an adverse inference instruction with respect

to the missing evidence.

III.    Whether reversible error was committed and whether the appellant was deprived of his federal and Michigan due process right to a fair trial when DNA evidence was admitted without informing the jury of the inherent limitations of the test methodology used.

IV.    Whether reversible error was committed and whether the appellant was deprived of his federal and Michigan due process rights to a fair trial when the trial judge refused to allow a jury view of the scene of the alleged homicide.

V.    Whether reversible error was committed and whether the appellant was deprived of his federal and Michigan due process right to a fair trial when the trial judge refused to allow a witness to testify in rebuttal to a claim that the appellant had fabricated testimony.

VI.    Whether reversible error was committed and whether the appellant was deprived of his federal and Michigan due process right to a fair trial when the trial judge limited the scope of the appellant's experts and refused to allow them to testify that the decedent had committed suicide.

VII.    Whether reversible error was committed and whether the appellant was deprived of his federal and Michigan due process right to a fair trial when several proposed witnesses were not allowed to testify.

VIII.    Whether a totality of the errors justified reversal and a new trial even if no single error would be sufficient.

The Michigan Court of Appeals affirmed Petitioner's convictions. *People v.*

*Duyst*, No. 234482, 2003 WL 21921163 (Mich. Ct. App. Aug. 12, 2003).

Petitioner then filed an application for leave to appeal to the Michigan Supreme

Court, presenting the same claims raised before the Michigan Court of Appeals. The

Michigan Supreme Court, denied leave to appeal. *People v. Duyst*, 469 Mich. 999 (Mich.

Jan. 27, 2004).

11

Petitioner, through new counsel, then filed a motion for relief from judgment in the trial court, presenting the following claims:

I.      The introduction of and substantial evidence on a clearly testimonial statement recorded more than a year prior to her suicide by Appellant's deceased wife purporting to implicate him in her death and in a prior assault (where there was no corroboration of appellant's involvement in the assault and where substantial evidence indicated he was clearly not involved) violated Appellant Duyst's federal and state constitutional right to confront and cross-examine his accuser.

II.     The substantial presentation of blood spatter evidence during several trial days, evidence consistently emphasized by the prosecution as determinative of guilt, by a witness touted by the prosecution as a national expert, where this evidence was in fact junk science, denied Appellant Duyst his due process right to a fair trial under the state and federal Constitutions.

III.    Appellant Duyst was denied the effective assistance of counsel guaranteed by the federal and state Constitutions where his trial attorney, with no strategic purpose, made several outcome-determinative errors.

IV.     Appellant Duyst was denied the effective assistance of counsel guaranteed by the federal and state Constitutions where his appellate counsel, who also represented Appellant Duyst at trial, on direct appeal, neglected "dead bang winners," including counsel's own ineffectiveness on several fronts.

V.      Appellant Duyst was denied his right to a fair trial under the state and federal Constitution when the prosecutor engaged in severe and repeated outcome-determinative misconduct.

VI.     Where Appellant Duyst is asserting the failure of trial counsel to investigate in relation to finding adequate experts and testing of physical evidence, and where preliminary analysis of key evidence by nationally-recognized experts reveals severe deficiencies in the prosecution's primary proofs, and where Appellant Duyst has consistently maintained his innocence, supported by two passed polygraphs, one of which was administered by the Michigan State Police, this Court should grant Appellant Duyst's request for release of physical evidence for testing under state and federal due process guarantees.

VII.    This Court should assess and consider Appellant Duyst's two passed polygraphs, one of which was administered by the Michigan State Police, in ruling on his motion for relief from judgment.

Petitioner also filed a Motion for the Release of Evidence for Independent Testing, Motion for Oral Argument, and Motion for an Evidentiary Hearing. The trial court denied all of Petitioner's motions. *People v. Duyst*, No. 00-09779-FC (Kent County Circuit Court Apr. 6, 2006).

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, presenting the same claims raised in the motion for relief from judgment and requesting an evidentiary hearing and the release of physical evidence for independent testing. The Michigan Court of Appeals denied leave to appeal. *People v. Duyst*, No. 269911 (Mich. Ct. App. Feb. 1, 2008).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, in which he requested a remand for an evidentiary hearing and the release of physical evidence for independent testing. The Michigan Supreme Court denied leave to appeal and the motion for remand and release of physical evidence. *People v. Duyst*, 480 Mich. 1055 (Mich. March 19, 2004). Justices Cavanagh and Kelly dissented. *Id.*

Petitioner then filed the pending petition for a writ of habeas corpus, presenting these claims:

I.    Whether this Court should grant a writ of habeas corpus where Petitioner Duyst was deprived of the effective assistance of counsel at trial and on direct appeal in connection with the three most critical pieces of evidence of the prosecution's entire case—his wife's "note from the grave," the prosecution's so-called "expert" blood spatter testimony, and the

13

unexamined ballistics evidence.

II.    Where Petitioner Duyst is asserting the failure of trial counsel to investigate in relation to finding adequate experts and testing of physical evidence, preliminary analysis of key evidence by nationally-recognized experts reveals severe deficiencies in the prosecution's primary proofs, Petitioner Duyst has consistently maintained his innocence, supported by two passed polygraphs, one of which was administered by the Michigan State Police, and since Petitioner has sought release of the physical evidence for independent testing and an evidentiary hearing at every step in the Michigan state court system at the earliest possible time (consistent with Petitioner's claim of ineffective assistance of trial and direct appeal counsel), whether this Court should grant Mr. Duyst's request for release of physical evidence for testing under the federal due process guarantee and whether this Court should conduct an evidentiary hearing

Petitioner also filed a request for discovery and an evidentiary hearing. The Court granted Petitioner's request for production of physical evidence for additional testing. Additionally, the Court granted his request for an evidentiary hearing. The pertinent evidentiary hearing testimony will be discussed below.

### III. Discussion

### A. Standard of Review

The petitioner's claims are reviewed against the standards established by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). The AEDPA provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

14

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (*quoting Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S. Ct. 2527, 156 L. Ed.2d 471 (2003) (*quoting Williams*, 529 U.S. at 413).  However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

15

*Harrington v. Richter*, __ U.S. __, 131 S. Ct. 770, 789 (2011), *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87 (internal quotation omitted).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams,* 529 U.S. at 412. Section 2254(d) "does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). "[W]hile the principles of "clearly established law" are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007), *citing Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F.Supp.2d 354, 359 (E.D. Mich.2002).

16

Lastly, a federal habeas court must presume the correctness of state court factual determinations.  See 28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption only with clear and convincing evidence.  *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## B.  Procedural Default

Respondent argues that Petitioner's claims are procedurally defaulted because they were not raised on direct review in state court.  Petitioner was represented by the same attorney at trial and on direct appeal.  His claims of ineffective assistance of trial counsel, therefore, are not defaulted because appellate counsel will rarely assert his own ineffectiveness at trial.  *Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004).  Respondent argues that this rule only applies where appellate counsel is appointed, not, as here, where appellate counsel is retained.  Respondent cites no case law supporting this distinction, nor has this Court identified any.  A criminal defendant is entitled to the effective assistance of counsel at trial and on direct appeal regardless of whether counsel is appointed by the State or retained by a defendant.  *Cuyler v. Sullivan*, 446 U.S. 335, 344 (198) ("The vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection.").  Thus, the Court concludes that these claims are not procedurally defaulted.  *Accord Combs v. Coyle*, 205 F.3d 269, 275-77 (6th Cir. 2000); *English v. Cody*, 146 F.3d 1257, 1263 (10th Cir. 1998) (holding that a federal

17

court on habeas review should never apply a state procedural bar to default an ineffective

assistance of trial counsel claim when trial and appellate counsel are the same).

### C.  Ineffective Assistance of Counsel

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984),

governs claims of ineffective assistance of counsel.  *Towns v. Smith*, 395 F.3d 251, 258

(6th Cir. 2005).  To show a violation of the Sixth Amendment right to effective assistance

of counsel, a petitioner must establish that his attorney's performance was deficient and

that the deficient performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.  An

attorney's performance is deficient if "counsel's representation fell below an objective

standard of reasonableness."  *Id.* at 688.  The defendant must show "that counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed the

defendant by the Sixth Amendment."  *Id.* at 687.  "Judicial scrutiny of counsel's

performance must be highly deferential."  *Id.* at 689.  The Supreme Court has "declined to

articulate specific guidelines for appropriate attorney conduct and instead [has]

emphasized that the proper measure of attorney performance remains simply

reasonableness under prevailing professional norms."  *Wiggins v. Smith*, 539 U.S. 510,

521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotes omitted)).

An attorney's deficient performance is prejudicial if "counsel's errors were so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

*Strickland*, 466 U.S. at 687.  The petitioner must show "a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been

18

different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction [or sentence] resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, __ U.S. __, 130 S. Ct. 1473, 1485 (2010).

> [T]he *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689-90.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. . . . The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by Strickland and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ___, 129 S.Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S.Ct. at 1420.  Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, __ U.S. __, 131 S. Ct. at 788.

In this case, the state court did not address the merits of Petitioner's claims because it held that they were barred by state procedural rules. Where the state court has altogether failed to review a particular claim, such a claim is reviewed *de novo*. Where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).[1]

### 1. Sandra Duyst's Handwritten Note

In his first claim that trial counsel was ineffective, Petitioner argues that counsel erred in failing to challenge the admissibility of Sandra's handwritten note. At trial, Petitioner's sister, Mary Ellen Spring, testified that, in the early spring of 1999, Sandra called her to tell her that, in case anything happened to her, she had left a letter in her china cabinet. Spring subsequently forgot about the note. Two or three months later, Spring was reminded of the note by friends to whom she had mentioned the note and Sandra's phone call. Spring contacted police, who found the note in Sandra's china

---

[1] Even if the Court were to apply the AEDPA's deferential standard of review, it would find that the denial of relief in this case was neither contrary to Supreme Court precedent nor an unreasonable application thereof. In other words, under either standard of review, the result on habeas review is the same. Petitioner is not entitled to relief.

2:08-cv-11728-VAR-DAS   Doc # 41   Filed 02/08/11   Pg 21 of 32   Pg ID 3738

cabinet.  Sandra's fingerprint was found on the letter and her DNA matched that detected

in traces of saliva found on the envelope.

During the preliminary examination, defense counsel challenged the letter's

admissibility.   The court overruled defense counsel's objections and received the letter

into evidence.  The court noted that the objections could be raised again if the case was

bound over.  At trial, counsel did not object to the note's admissibility.  The letter was

admitted into evidence by stipulation of both parties.  The letter read:

> February 28, 1999
>
>     To anyone interested in what happened to me, look to David Duyst,
> Sr.  On November 19th, my accident was no accident.  David beat me with
> a hammer/axe.  He came from behind while I was in Dexter's stall.  He hit
> me repeatedly.  Only when I told him I would sell my horse and support
> him in leaving the partnership he had formed with my dad would he let me
> go.  I ran to Gray's house when David called 911.  I feared he would come
> back and kill me.
>
>     If anything has happened to me, look first to David Duyst, Sr.  He
> could be my killer.  I would <u>never</u>[2] commit suicide.  He may have killed me.
>
> Respectfully,
>
> Sandra A. Duyst

Petitioner argues that defense counsel should have challenged this letter's

admissibility at trial under the Confrontation Clause and that the admission of the letter

was devastating to the defense.  Petitioner further argues that counsel's error was

---

[2] The word "never" was underlined three times in the original letter.  Tr., Vol.
XIV, at 49.

compounded because, even if the objection was unsuccessful at trial, it would have

preserved the issue for appellate review and relief certainly would have been obtained

under *Crawford v. Washington*, 541 U.S. 36 (2004).

Defense counsel testified at the evidentiary hearing regarding his reasoning for not

challenging the letter's admissibility at trial. He characterized the note as an important

part of the prosecution's *and* defense's cases. He explained that, as he investigated the

case in preparation for trial and discovered that there was unrebutted support for the

argument that the first bullet rendered Sandra incapable of firing a second shot, he had to

develop some plausible explanations for Sandra's behavior. He felt that one plausible

explanation for Sandra's behavior was that she was attempting to frame her husband for

her murder. He felt the note assisted with that theory because it identified her husband as

the cause of her significant head injuries on November 19, when she had previously told

many people that her horse Dexter kicked her repeatedly, and she credited her husband

with saving her life. Trial counsel testified that he also presented an expert witness who

would testify that the note, with the word "suicide" underlined three times, could actually

be consistent with a person who is contemplating suicide. In fact, the defense's two

expert witnesses in psychiatry and psychology testified that much of Sandra's behavior,

including this note, was consistent with someone who was contemplating suicide.

Defense counsel also testified that he did not believe a motion to suppress the note

would have been successful under the state of the law as it then existed. He discussed the

application of *Ohio v. Roberts*, 448 U.S. 56 (1980), *overruled by Crawford v.*

22

*Washington*, 541 U.S. 36 (2004), and the state court's ruling at the preliminary

examination. Based upon his experience, he believed that his objection would be futile.

Finally, he testified that, while the trial court likely would have given a limiting

instruction had he requested one, he felt that such an instruction was of negligible

importance given the other more critical issues in the case, notably the testimony that

Sandra was shot two times and that the first bullet would have rendered her unable to pull

the trigger a second time.

Defense counsel's testimony concerning the note reveals a carefully considered

decision, reached with an awareness of the relevant law, an appreciation for the

challenges the defense faced in light of the substantial evidence against Petitioner, and a

consideration of the practices of the trial court. Petitioner was entitled to competent

representation, not a "perfect defense." *Crehore v. U.S.*, 127 F. App'x 792, 796 (6th Cir.

2005). Defense counsel's decision in this regard was competent.

Moreover, even if the note would have been suppressed by the trial court,

Petitioner has not shown that defense counsel was ineffective for not moving for its

suppression. Defense counsel articulated a reasonable explanation for his decision.

While another attorney may have proceeded differently, "[t]here are . . . 'countless ways

to provide effective assistance in any given case. Even the best criminal defense

attorneys would not defend a particular client in the same way.'" *Richter*, 131 S. Ct. at

788-89. Competent counsel need not be "a flawless strategist or tactician" and "an

attorney may not be faulted for a reasonable miscalculation." *Id.* at 791. At worst,

defense counsel's decision not to move to suppress the note was a reasonable

miscalculation, which falls far short of *Strickland*'*s* high bar.

## 2. Blood Spatter Testimony

In his second ineffective assistance of trial counsel claim, Petitioner argues that counsel was ineffective in his handling of the prosecution's blood spatter expert, Rod Englert, and in failing to offer a defense expert on blood spatter.

Petitioner argues that defense counsel should have challenged Englert's qualifications as an expert witness, and sought to exclude his testimony in its entirety or, at the very least, cross-examined him more effectively by using materials identified by Petitioner in these habeas proceedings. Defense counsel did not challenge Englert's qualifications as an expert witness, nor did he *voir dire* Englert on his qualifications. Petitioner argues that a great deal of material was available to challenge Englert's qualifications, and highlight his shortcomings and faulty analysis.

Defense counsel's testimony in this Court was this: he was aware that, prior to Petitioner's trial, Englert had been qualified as an expert in hundreds of cases. He felt that an objection to Englert's qualification as an expert would have been futile. He also explained that he felt that because Englert was an experienced witness who clearly was comfortable advocating his position, questioning Englert further on his qualifications would have allowed him to authenticate himself even more in the eyes of the jury, enhancing rather than diminishing Englert's credibility. Defense counsel also testified that, while he was not aware of all of the particular documents presented by Petitioner at the evidentiary hearing, he was aware that Englert had antagonists in the world of blood spatter experts. Nevertheless, he testified that, even if he had been aware of the

25

documents cited by Petitioner, he did not believe that an objection to his qualifications as an expert witness would have been successful.

In preparation for trial, counsel discussed the crime scene with Leonard Speckin. Defense counsel knew Speckin to be a credible forensic expert with experience and knowledge in the area of crime scene reconstruction. Speckin was not called as a witness because he was unable to give favorable testimony on ballistics or blood spatter evidence. Speckin informed defense counsel that Englert had critics and antagonists.

Defense counsel decided that it would be prudent to contact one of Englert's antagonists to review Englert's analysis and conclusions. Defense counsel contacted Toby Wolson, who he understood to be an Englert critic. Wolson had a bachelor of science degree and a masters of science degree in serology from Michigan State University; defense counsel believed him to have an expertise in blood spatter. Defense counsel sent relevant photographs and whatever reports had been supplied to the defense by the prosecution to Wolson in Miami. Wolson reviewed the materials and concluded that, although he previously had been a vocal critic of Englert's, he did not disagree with Englert's conclusions regarding the blood spatter evidence.

Defense counsel's handling of Englert's qualification as an expert and cross-examination of him was reasonable. Englert's testimony in this habeas proceeding was taken by telephone deposition. Petitioner's counsel challenged many details contained in Englert's curriculum vitae and trial counsel questioned Englert regarding what some critics have said about his education and abilities. While Petitioner may have succeeded

26

in casting some doubt on certain details of Englert's curriculum vitae, such doubts were insufficient to prevent Englert from qualifying as an expert.  Nor would they have caused the jury to seriously question Englert's credibility.  The questioning of Englert by Petitioner's counsel tends to support the reasonableness of defense counsel's decision.  Defense counsel was reasonable in concluding that attempting to discredit Englert in front of the jury would have had the opposite effect, and would have allowed Englert to bolster his credibility with the jury.

Additionally, defense counsel's failure to present a defense expert witness regarding blood spatter was not unreasonable.  With regard to a claim that counsel was ineffective for failing to conduct an adequate investigation:

> [D]ecisions made by trial counsel after "less than complete investigation," . . . "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Brown v. Smith*, 551 F.3d 424, 430 (6th Cir. 2008), *quoting Strickland*, at 690-91.

Defense counsel attempted to obtain an expert who would rebut Englert's testimony.  He discontinued his investigation only after Speckin and Wolson failed to provide him with any analysis favorable to the defense.  "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense."  *Richter*, 131 S. Ct. at 791.  Often,

"cross-examination will be sufficient to expose defects in an expert's presentation." *Id.*
Here, counsel's attempts to obtain a favorable expert witness and his cross-examination
of Englert indicate capable advocacy.

### 3. Ballistics Evidence

Finally, Petitioner argues that counsel's handling of the ballistics evidence was
ineffective. Petitioner argues that there was substantial ballistics evidence available to the
defense prior to trial which would show that the gun discharged two rounds through the
single pull of the trigger, and that counsel was ineffective for failing to investigate and
present this testimony.

Frederick Wentling testified as an expert in ballistics during the evidentiary
hearing in this Court. He testified that defense counsel contacted him in 2001 and asked
him to look at certain transcripts and case files. After reviewing the pertinent material, he
informed defense counsel that while it would be possible for the firearm that caused
Sandra Duyst's death to malfunction by having two shots discharged with one trigger
pull, he was not able to render a definite opinion without further analysis. His last contact
with defense counsel was in April 2002. Wentling further testified that he was contacted
by counsel retained by Petitioner in connection with his state motion for relief from
judgment in 2004 or 2005. Then, he rendered a preliminary report regarding the firearm.
There, he mentioned the possibility that the weapon could have double-fired, but he was
unable to say with any certainty because he was not able to conduct a hands-on evaluation
of the firearm.

Wentling testified that, in 2009, in connection with the habeas petition, he was able to examine the firearm. He found the firearm to be unusually dirty. He test-fired the firearm and found that it had a weak ejection pattern. Wentling testified that the dirtiness of the weapon and its weak ejection pattern make it possible that there could be malfunctions, including a double firing. On cross-examination, he testified that the evidence collected from the crime scene, two discharged cartridge cases and a round found in the chamber of the firearm, indicated that the gun was cycling properly. Wentling also discussed on cross-examination the safety features of this firearm: (i) a trigger safety, designed to prevent the trigger from being pulled other than by firing it normally; (ii) a striker safety plunger, designed to prevent the striker from striking the primer; and (iii) a disconnector, designed to prevent a double-fire. Wentling's tests revealed no malfunctioning of any of these safety mechanisms.

Defense counsel testified that, to help him assess the firearm evidence, he retained David Townshend. Townshend was a retired State Police Lieutenant with experience in firearms. Townshend spent over 100 hours investigating the case and defense counsel met with him at least ten times. He and Townshend obtained the history of this particular firearm and general information on the model of firearm. They searched for information regarding slam firing, double firing, chain firing, and any other evidence which might show that this type of weapon had a history of malfunctioning. After completing his investigation, Townshend informed defense counsel that double-firing of the weapon did not happen. Because he could not support the double-firing theory, defense counsel did

not call Townshend as a witness.  Nevertheless, Townshend assisted defense counsel in trial preparation and cross-examination of prosecution witnesses.

Defense counsel testified that, after trial, he continued to try to find an explanation for Sandra's death.  He did so, not because he thought he was ineffective, but because he felt that there was an explanation for the events as they transpired and he felt duty-bound to continue to pursue an explanation.  He became aware of Frederick Wentling.  He asked Wentling to review Brad Bacheldor's testimony and provide a preliminary report regarding the possible double-firing of the firearm.  Defense counsel testified that when he reviewed Wentling's preliminary report he felt that Wentling provided no more information than had been provided in Townshend's initial report; that is, that this type of weapon was capable of double-firing, but nothing favorable beyond that.

Balancing his opinion that Wentling provided nothing beyond what already had been provided by Townshend, against the fact that the trial had concluded, and considering the money already spent, defense counsel did not pursue consultation from Wentling.

Defense counsel's decision to end pursuit of Wentling's testimony was reasonable. He considered the information already obtained from Townshend and did not believe that further consultation with Wentling would provide additional helpful information.  In fact, Wentling's testimony in this Court tends to support defense counsel's conclusion.  While Wentling testified that it was possible that the weapon could have misfired, he was unable to testify that it did so, or that it was probable that it did so.  He also testified that the

30

several layers of safety mechanisms inherent in the gun's functioning did not malfunction in his test firing.  Additionally, while defense counsel did not present expert witnesses in ballistics, he testified that Townshend assisted him in preparing cross-examination of prosecution expert witnesses.  Defense counsel's cross-examination of these witnesses at trial shows an attorney familiar with the ballistics evidence and well-prepared to cross-examine the witnesses.

The Court concludes that defense counsel's decisions regarding investigation of ballistics evidence and preparation for trial were reasonable, and his representation was not ineffective.  Habeas relief is denied on this claim.

### IV.  Certificate of Appealability

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253.  Rule 11 of the Rules Governing Section 2254 Proceedings now requires that the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c)(2).  A petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (citation omitted).

The Court finds that jurists of reason could find this resolution of Petitioner's ineffective assistance counsel claims to be debatable or wrong.  Accordingly, the Court grants a certificate of appealability.

### V.  Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED** and the matter is **DISMISSED WITH PREJUDICE.**

A certificate of appealability is **GRANTED**.

**IT IS ORDERED**.


S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  February 8, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on February 8, 2011.

s/Carol A. Pinegar
Deputy Clerk

32